UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

CAROL A. SELL )
)
V. ) NO. 2:14-CV-50
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. The plaintiff's disability insurance benefits were administratively terminated effective October 1, 2008, after the defendant Commissioner determined that medical improvement had occurred to the extent that plaintiff was now capable of substantial gainful activity. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 14], while the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 23].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

In July of 1996, the plaintiff applied for disability insurance benefits. On July 7, 1997, an ALJ found that the plaintiff was disabled as of May 1, 1996, and was entitled to benefits. (Tr. 203-210). From time to time, the Social Security Administrations conducts "continuing disability reviews" to determine if an individual receiving benefits has experienced medical improvement related to their ability to engage in substantial gainful activity, which would result in a cessation of benefits. The first such review of the plaintiff's condition occurred in March of 2002, and it was found that she had the Residual Functional Capacity ["RFC"] to perform less than a significant range of sedentary work and was still disabled. Another such review was conducted in October, 2008. It resulted in a determination that the plaintiff had experienced medical improvement and that her disability had ceased.

The plaintiff requested and received a hearing before the present ALJ, which was held on October 29, 2010. He determined that she had in fact experienced medical improvement and was no longer disabled (Tr. 639-647). Plaintiff appealed that decision to Appeals Council. While the determination that she was no longer entitled to disability insurance

2

benefits was being considered by the Appeals Council, plaintiff filed an application for supplemental security income in January, 2011.

In January 2012, the Appeals Council remanded the case to the ALJ to determine whether plaintiff was disabled through the date of the ALJ's final decision. This was to ensure that even if she had experienced medical improvement in the impairments which initially led to her originally being found disabled in 1996, there were no other severe impairments present which would render her disabled in the present. The Appeals Council also ordered that the disability insurance and supplemental security income claims be consolidated for ultimate determination by the ALJ. (Tr. 1033-34). To that end, another administrative hearing was held. The ALJ then entered one hearing decision regarding her disability insurance claim and a separate claim regarding her application for supplemental security income, finding that her disability ceased in October, 2008, and that she was still not disabled through the dates of those decisions. These became the final decision of the Commissioner and are the subject of this judicial appeal.

In the original hearing decision which found the plaintiff to be disabled as of May 1, 1996, the ALJ found that the plaintiff suffered from a severe gastrointestinal impairment "which precludes her from performing any substantial gainful activity, even at the secondary level, on a regular and sustained basis." (Tr. 207). He so found because "the claimant has received aggressive treatment for gastrointestinal symptoms since May, 1996, when she required hospitalization for dehydration, irritable bowel syndrome, and diarrhea. In June, 1996, she had insertion of double lumen port-a-cath to self administer IV fluids on a weekly basis or more often. Endoscopy shows active gastritis and Helicobacter pylori infection."

3

She was under the care of medical specialists for the condition. One provider noted that the plaintiff had "lost weight at each M.D. appointment," and experienced severe continuing diarrhea. (Tr. 201). She received was receiving daily injections of Phenagrin, with Darvacet every 6 hours for the pain. (Tr. 202).

The original ALJ stated that he recommended "reevaluation of her status...to determine if the claimant has experienced medical improvement and can return to substantial gainful activity." Because, at the time of the decision she could not "tolerate a standard work day on a regular basis," he found that she was entitled to a period of disability benefits. (Tr. 208-210).

Plaintiff's lengthy medical history is summarized in the Commissioner's brief as follows:

> During 1996 and 1997, Plaintiff was aggressively treated for h-pylori infection and IBS (Tr. 131-32, 154-625, 181, 206-10). In May 1996, Plaintiff was hospitalized for dehydration, IBS, and diarrhea (Tr. 167-69, 267). In June 1996, Plaintiff had a catheter placed for self administration of IV fluids on a weekly basis (Tr. 122, 148-50, 170, 267). An endoscopy showed active gastritis and h-pylori infection (Tr. 267). In July 1997, Plaintiff's physician noted that she had severe diarrhea and dehydration and required daily Phenergan injections and Darvocet every few hours (Tr. 202). Another physician reported that Plaintiff required twice weekly IV therapy and frequent injections for nausea (Tr. 181). In July 1997, an ALJ found Plaintiff was disabled as of July 1996, due to severe gastrointestinal impairments, gastritis, and h-pylori infection (Tr. 206-10).
> During 2000, Plaintiff saw nurse practitioners at the Johnson City Downtown Clinic for chronic abdominal pain, pancreatitis, and pernicious anemia, regularly requesting medication refills (Tr. 429-37). Plaintiff also reported a number of trips to the emergency room (Tr. 429, 433). In May 2000, Plaintiff went to the emergency room complaining of nausea, vomiting, and headache (Tr. 475). She was given medication and IV hydration (Tr. 476). In June 2000, she went to the emergency room for pneumonia (Tr. 473-74). In September 2000, she went to the emergency room complaining of vomiting and abdominal pain (Tr. 471). Plaintiff was given medication and told to drink plenty of fluids (Tr. 472). In October 2000, she went to the emergency room complaining of diarrhea and requesting IV hydration (Tr. 469). A doctor told Plaintiff she would not benefit from IV hydration and recommended

that she drink plenty of fluids and follow up with her primary care physician (Tr. 469).

Plaintiff continued to see nurse practitioners at the Johnson City Downtown Clinic during 2001(Tr. 419-27). In May 2001, Plaintiff went to the clinic for medication refills, reporting that she was doing "reasonably well" but still needed to take Phenergan twice a day (Tr. 423). The nurse noted that Plaintiff had increased her smoking (Tr. 423). Plaintiff returned to the clinic in August 2001, complaining of nausea and requesting pain medication (Tr. 421). The nurse instructed Plaintiff on proper use of medication (Tr. 421-22). Plaintiff was back at the clinic in November 2001, requesting pain medication (Tr. 420). A nurse provided pain medication and instructed Plaintiff to continue B12 injections (Tr. 420).

Plaintiff also reported several hospitalizations during 2001 (Tr. 419). Plaintiff went to the emergency room in March 2001 complaining of nausea and vomiting, as well as stress due to her brother's recent death (Tr. 465-66). She was hospitalized in October 2001 for abdominal pain and atypical chest pain (Tr. 419, 61). A continuing disability review on March 25, 2002, found that Plaintiff continued to meet the standards for social security disability (Tr. 223-26).

In December 2002, Plaintiff began seeing William Kincaid, M.D., and Kelley Mayden, F.N.P., at the McLeod Cancer and Blood Center for blood work and B12 injections (Tr. 742-49). Plaintiff first saw Dr. Kincaid on December 6, 2002, complaining of anemia (Tr. 750-53). Findings upon physical examination were unremarkable; Plaintiff had normal gait, station, and range of motion, and a chest x-ray was normal (Tr. 751, 839). Dr. Kincaid noted that Plaintiff's anemia was corrected (Tr. 751). Laboratory testing showed h-pylori antibody and high levels of B12 (Tr. 824, 826-27). Plaintiff saw Ms. Mayden at the Blood Center in January 2003 for a bone marrow aspiration and biopsy (Tr. 748). A pathology report showed macrocytic erythrocytes but was otherwise unremarkable (Tr. 807-08). In February 2003, clinicians observed that Plaintiff was asymptomatic (Tr. 747). Diagnoses included B12 deficiency, macrocytosis, intermittent nausea and vomiting, ill-defined eating disorder, abdominal pain, hypertension, and pancreatitis (Tr. 742). Dr. Kincaid noted that Plaintiff continued to smoke one to two packages of cigarettes a day (Tr. 743, 746). Ms. Mayden cautioned Plaintiff against use of a tanning bed and excessive sun exposure (Tr. 745). Plaintiff saw Dr. Kincaid in October 2013, complaining of a red spot on her right heel after hiking (Tr. 741). Dr. Kincaid continued Plaintiff on B12 and urged her to stop smoking (Tr. 741).

In January 2004, Plaintiff asked Ms. Mayden for pain medication (Tr. 738). The nurse refused, explaining that she was unable to prescribe narcotics while Plaintiff was under the care of another physician who prescribed narcotics (Tr. 738). An abdominal ultrasound and chest x-rays in April 2004 were normal (Tr. 837-88). A computed tomography (CT) scan of Plaintiff's abdomen showed mild hepatomegaly and biliary duct dilation (Tr. 835). Testing was positive for opiates (Tr. 796).

Later that month, Plaintiff complained to Dr. Kincaid of episodic nausea and vomiting (Tr. 736). Dr. Kincaid noted recent abnormal liver function tests, which he

5

thought were related to Plaintiff's use of pain medication (Tr. 736). Dr. Kincaid again encouraged Plaintiff to stop smoking and referred her to another physician (Tr. 737). Plaintiff saw Dr. Kincaid again in October 2004, complaining of B12 deficiency and fatigue (Tr. 735). Blood work was normal other than an elevated mean corpuscular value (MCV) (Tr. 735).

Plaintiff saw Ms. Mayden in January 2005, complaining of intermittent nausea and chronic fatigue (Tr. 733-34). Plaintiff's weight was 131 (Tr. 733). Ms. Mayden provided Prevacid and Phenergan (Tr. 734). She noted that Plaintiff had many risk factors for osteoporosis including poor nutrition, smoking, and multiple carbonated beverages each day; she ordered a bone densitometry (Tr. 734). In April 2005, Plaintiff returned to the Blood Center, two months overdue for her monthly B12 injection (Tr. 730). Plaintiff was out of B12 and had not called in to get more (Tr. 730). She complained of vomiting, nausea, and abdominal pain, attributing this to the fact that she had recently left her husband and was going through a divorce (Tr. 730). Plaintiff reported that she had been taking Lortab and Percocet but was still having difficulty with pain (Tr. 730). Ms. Mayden diagnosed B12 deficiency, situational anxiety, chronic nonmalignant pain, history of pancreatitis, history of h-pylori, chronic nausea, and osteopenia (Tr. 731). She provided a B12 injection and Ativan for anxiety and nausea (Tr. 731). Ms. Mayden renewed Plaintiff's prescription for Lortab and provided additional injectable pain medication at Plaintiff's request, advising Plaintiff to use it sparingly (Tr. 732).

Plaintiff went to North Side Hospital in Johnson City, Tennessee, on January 5, 2007, complaining of anxiety and shortness of breath (Tr. 544, 548). Upon admission, she was noted to be "hysterical" with high blood pressure (Tr. 544). She was diagnosed with allergic reaction and given medications, including Medrol (Tr. 545). A CT of Plaintiff's abdomen showed a small fluid collection in the right posterior but was otherwise unremarkable (Tr. 543).

Plaintiff saw Christopher Lind, M.D., at the Vanderbilt Clinic on February 15, 2007, complaining of intermittent vomiting, abdominal pain, diarrhea, and a 15-pound weight loss over the past year (Tr. 553). Dr. Lind recalled that he had seen Plaintiff for similar symptoms ten years earlier (Tr. 553). A review of systems was negative for other than the symptoms noted (Tr. 554). Dr. Lind recommended laboratory testing and prescribed low dose antibiotics (Tr. 554). A biopsy of Plaintiff's stomach and esophagus in March 2007 showed scattered h-pylori-like organisms (Tr. 550). Plaintiff was diagnosed with chronic active superficial gastritis with scattered h-pylori-like organisms (Tr. 552).

Plaintiff first saw Rita Plemmons, M.D., in July 2007 to establish care (Tr. 571-73). Plaintiff reported a "very long and fairly convoluted" medical history, including a history of hpylori, pancreatitis, pernicious anemia, and anxiety (Tr. 571). Her primary complaints were neck pain and nausea (Tr. 571). Dr. Plemmons observed that Plaintiff was very slender and smelled strongly of smoke (Tr. 571). On physical examination, Plaintiff had mild diffuse tenderness, but good strength and normal gait (Tr. 571). Dr. Plemmons diagnosed chronic pancreatitis, chronic gastritis, possibly from h-pylori, and anxiety (Tr. 571). She provided medications,

6

administered a B12 injection, and instructed Plaintiff to follow up with mental health and quit smoking (Tr. 571-72). She also ordered Plaintiff's past medical records (Tr. 572). Laboratory testing that day showed normal B12 levels (Tr. 574-76).

Plaintiff returned to Dr. Plemmons in August 2007 for medication refills (Tr. 569). Plaintiff requested narcotic pain medications, reporting she had taken them in the past, and refills of Xanax, acknowledging that she had not yet sought mental health services (Tr. 569-70). Dr. Plemmons noted she had not yet received Plaintiff's past treatment records (Tr. 569). She diagnosed chronic pancreatitis, anxiety, allergies by history, and elevated blood pressure (Tr. 569). She provided medications, administered a B12 injection, and strongly encouraged Plaintiff to contact mental health to discuss whether Xanax was appropriate (Tr. 569).

Plaintiff saw Dr. Plemmons in September 2007, reporting that Darvocet didn't help much, but it was better than Ultram (Tr. 565-67). Plaintiff said she had contacted Watauga Mental Health and planned to go there for an appointment (Tr. 566). Dr. Plemmons diagnosed pernicious anemia, abdominal pain with gastritis and h-pylori infection, and questionable pancreatitis (Tr. 566). She continued Plaintiff's medications, including Darvocet and Xanax, and provided a B12 injection (Tr. 566). Plaintiff returned to Dr. Plemmons in October 2007, for medication refills, complaining of continued pain and leg cramps (Tr. 563-64). Dr. Plemmons diagnosed pancreatitis, abdominal pain, pernicious anemia, and anxiety; and provided medications (Tr. 563). In November 2007, Plaintiff told Dr. Plemmons that her stomach and pain were a little bit better (Tr. 561-62). Plaintiff declined a flu shot and reported that she was taking an herbal supplement for her cholesterol, provided from someone selling Amway-type products (Tr. 561). Dr. Plemmons refilled Plaintiff's medications (Tr. 561).

On November 7, 2007, Plaintiff saw psychiatrist Nuri Yong, M.D., upon referral from Dr. Plemmons (Tr. 578, 689). Plaintiff said she recently changed primary care practitioners (PCP) and her current PCP was not comfortable prescribing Xanax, which she had taken for nine years (Tr. 578, 581). Plaintiff reported that she was currently on probation for violation of a restraining order (Tr. 578). Upon examination, Dr. Yong observed that Plaintiff was alert, oriented, interactive, and pleasant, with good eye contact, normal speech, and a slightly dysphoric mood (Tr. 578). The doctor diagnosed generalized anxiety disorder and prescribed Xanax (Tr. 579).

Plaintiff saw Dr. Plemmons on November 29, 2007, reporting that she was doing a little better (Tr. 559-60). Dr. Plemmons diagnosed elevated blood pressure, abdominal pain, chronic pancreatitis, and pernicious anemia, and provided medications (Tr. 559). She had not received records showing that narcotic medications were appropriate and she declined to provide alprazolam, noting that Plaintiff should be getting it from "mental health" (Tr. 559).

Plaintiff saw Dr. Plemmons in January 2008, requesting Lortab medication for left hip pain (Tr. 555-56). Plaintiff said she was carrying her grandchild over the holidays and that caused her pain to flare (Tr. 555). Plaintiff told Dr. Plemmons to contact her prior doctor for treatment records (Tr. 555). Dr. Plemmons diagnosed

7

joint syndrome, abdominal pain, chronic pancreatitis, and pernicious anemia (Tr. 555). She prescribed Ultram, provided a B12 injection, and encouraged Plaintiff to exercise and quit smoking (Tr. 555). She told Plaintiff that she would not promise to give her Lortab even if her prior physician thought it was appropriate (Tr. 555). Plaintiff saw Dr. Yong that same day, requesting Xanax (Tr. 577). Plaintiff denied depression but reported continued episodes of anxiety (Tr. 577). Dr. Yong provided Xanax (Tr. 577).

Plaintiff first saw Bobby Reynolds, F.N.P., at the Appalachian Medical Center, on February 27, 2008, to establish care (Tr. 604-05). Plaintiff reported a long history of chronic bronchitis, reflux, and pain, and stated that she had previously been on a regimen of opiate pain medications to use "by the clock" to "maintain freedom from pain" (Tr. 604). Plaintiff also reported recent situational depression (Tr. 604). Plaintiff weighed 117 pounds (Tr. 604). Mr. Reynolds diagnosed h-pylori, pernicious anemia, osteoarthritis, degenerative joint disease, chronic obstructive pulmonary disorder (COPD), and anxiety (Tr. 605). He prescribed Xanax, Phenergan, Carafate, and Lortab, and encouraged Plaintiff to exercise, diet, and quit smoking (Tr. 605). Magnetic resonance imaging (MRI) of Plaintiff's lumbar spine on March 17, 2008, showed mild facet hypertrophy without significant resulting stenosis (Tr. 607). Plaintiff returned to Mr. Reynolds later that month for medication refills, noting her long-standing issues with back pain, GERD, COPD, and headaches (Tr. 602). Plaintiff's weight was 114 pounds (Tr. 603). Mr. Reynolds diagnosed COPD, h-pylori, osteoarthritis, degenerative joint disease, pernicious anemia, and anxiety; and provided medications, including Xanax and Percocet (Tr. 603).

In April 2008, Plaintiff saw Mr. Reynolds for medication refills (Tr. 600). Plaintiff requested narcotic drugs to "maintain freedom from pain" (Tr. 600). Mr. Reynolds recorded Plaintiff's weight at 116 pounds and refilled Plaintiff's medications (Tr. 601). In May 2008, Plaintiff returned to Mr. Reynolds for refills, complaining of cough and congestion (Tr. 599). Plaintiff weighed 119 pounds (Tr. 599). Mr. Reynolds diagnosed sinusitis, bronchitis, and cough, and provided medication for congestion (Tr. 599). Later that month, Mr. Reynolds found normal strength and full range of motion, with some lumbar/sacral tenderness (Tr. 59). Plaintiff weighed 116 pounds (Tr. 597). Mr. Reynolds diagnosed COPD, osteoarthritis, degenerative joint disease, and anxiety; and provided medications, including Percocet and Roxicodone (Tr. 598). He encouraged Plaintiff to diet, exercise, and stop smoking (Tr. 596).

When Plaintiff saw Mr. Reynolds in July 2008, complaining of back pain, headache, and situational stress, she weighed 119 pounds (Tr. 593-94). Upon physical examination, Mr. Reynolds found normal strength and full range of motion, with some lumbar/sacral tenderness (Tr. 594). He provided medications, including OxyContin, Roxicodone, and Xanax (Tr. 594). He encouraged Plaintiff to diet, exercise, and stop smoking (Tr. 594 ).

On July 21, 2008, Dr. Williams, a state agency physician, opined that Plaintiff's mental impairments appeared to be non-severe, based primarily on her activities of daily living (Tr. 627). On July 30, 2008, state agency physician Rita

8

Misra, M.D., conducted a continuing disability review (Tr. 628-31). She opined that Plaintiff's physical impairments were nonsevere, singly or combined (Tr. 628, 632). Dr. Misra noted that from 1994 through 1998, Plaintiff had issues with gastritis, abdominal pain, and bowel disease (Tr. 630). But Plaintiff had no significant GI issues since the comparison point date in 2002, and significant medical improvement had occurred (Tr. 630-31). Plaintiffs weight was stable, her reflux was stable on medication, and physical examinations in response to complaints of back and hip pain were normal (Tr. 630-31). Plaintiff's subsequent complaints of pain were not supported by medical evidence, and her reflux was well controlled with medication (Tr. 630).

In August 2008, Mr. Reynolds measured Plaintiff's weight at 122 pounds (Tr. 591-92). Upon physical examination, Plaintiff showed normal strength and full range of motion, with some lumbar/sacral tenderness (Tr. 592). Mr. Reynolds provided medications and encouraged Plaintiff to diet, exercise, and stop smoking (Tr. 592). Plaintiff saw Mr. Reynolds again in September 2008 (Tr. 589-90). Upon physical examination, Mr. Reynolds found normal strength and full range of motion, with some lumbar/sacral tenderness (Tr. 590). Plaintiff weighed 120 pounds (Tr. 589). Mr. Reynolds provided medications and again encouraged Plaintiff to diet, exercise, and stop smoking (Tr. 590). Plaintiff returned to Mr. Reynolds in October 2008, weighing 121 pounds (Tr. 587). Plaintiff complained of back pain, COPD, and recent stress related headache (Tr. 587). Findings upon physical examination were normal other than some lumbar/sacral tenderness (Tr. 588). Mr. Reynolds provided medications and told Plaintiff to diet, exercise, and stop smoking (Tr. 588).

In November 2008, Plaintiff told Mr. Reynolds she was satisfied with her current treatment plan and wanted no further intervention for back pain (Tr. 585). Plaintiff reported a history of reflux, well-controlled on medication (Tr. 585). She complained of headache and situational anxiety, caused by home stressors (Tr. 585). Plaintiff weighed 123 pounds (Tr. 585). Upon examination, Mr. Reynolds found that Plaintiff had normal strength and full range of motion, with some lumbar/sacral tenderness (Tr. 586). The nurse provided medications and encouraged Plaintiff to diet, exercise, and stop smoking (Tr. 586).

On February 27, 2009, state agency medical consultant Charles Settle, M.D. conducted a continuing disability review (Tr. 632). After reviewing Plaintiff's records, he noted Plaintiff's history of gastrointestinal disorders, gastritis, h-pylori, and abdominal pain from 1994 through 2000 (Tr. 634). Medical treatment records from 2006 and 2007 showed mild physical findings (Tr. 634). Dr. Settle found that Plaintiff's weight was stable and her hypertension and reflux were controlled with medication (Tr. 635).

Chest x-rays on March 18, 2010, were unremarkable (Tr. 830). An abdominal CT on March 26, 2010, showed no specific structural abnormality of the stomach (Tr. 833).

Plaintiff was hospitalized at the Johnson City Medical Center from March 29, 2010, through April 2, 2010, for a stroke workup and to rule out heart problems after she reported recent left upper extremity weakness (Tr. 840-84). A variety of

9

diagnostic tests, including a head CT scan, brain MRI, blood study, and cervical spine CT, were negative (Tr. 841-42). Plaintiff requested pain medication, but doctors noted drug-seeking behavior, opiate dependence, and narcotic abuse, and referred her to psychiatry (Tr. 841, 848, 853, 857). Plaintiff reported a history of pancreatitis, but doctors noted that a GI evaluation in July 2009 showed no evidence of chronic pancreatitis (Tr. 842). Other than Plaintiff's denial of opiate dependence, findings on mental status examination were normal (Tr. 850). A psychiatrist noted that Plaintiff had no interest in discontinuing opiates or detoxing, so he recommended that Plaintiff follow up with pain management (Tr. 850). An occupational therapist observed that Plaintiff was able to groom herself and put on makeup with minimal assistance, she was able to walk without assistance, and she was independent in her activities of daily living and able to drive (Tr. 854-5).

Plaintiff returned to the hospital on April 6, 2010, complaining of acute headache and left arm weakness, and claiming she had stomach cancer (Tr. 885-897). Emergency room clinicians noted that Plaintiff was a poor historian with multiple complaints (Tr. 887, 893). A GI evaluation in 2009 showed no evidence of chronic pancreatitis (Tr. 885). A CT of Plaintiff's head was normal (Tr. 896). John Sawaf, D.O., diagnosed intractable headache, opiate dependence, chronic pain syndrome, and left arm and leg weakness (Tr. 886). He provided IV pain medication and referred Plaintiff to neurology (Tr. 886).

Testing on April 9, 2010, was positive for barbiturates, benzodiazepines, opiates, and oxycodone (Tr. 777). Testing on April 16, 2010, was positive for barbiturates, benzodiazepines, opiates, and oxycodone (Tr. 774). Testing on April 23, 2010, was positive for opiates, oxycodone, and benzodiazepines (Tr. 772). Testing on April 28, 2010, was positive for opiates, barbiturates, and benzodiazepines (Tr. 770). Testing on April 29, 2010, was positive for oxymorphone, oxycodone, and barbiturates and benzodiazepines (Tr. 765, 768). Testing on May 7, 2010, was positive for opiates and oxycodone (Tr. 764, 766).

Plaintiff returned to the emergency room on May 11, 2010, complaining of hip pain after a fall and repeatedly requesting Demerol (Tr. 898-900). Admissions personnel observed that Plaintiff was ambulating well, with a full, steady gait, even though she was wearing high-heeled shoes (Tr. 898-99, 902). Plaintiff left the emergency room before any x-rays were taken (Tr. 899-900). Clinicians commented on her "drug-seeking behavior" (Tr. 899).

Testing on May 21, 2010; May 27, 2010; and June 3, 2010; was positive for oxycodone and opiates (Tr. 755-56, 758, 761-62). Plaintiff returned to the emergency room on June 27, 2010, complaining of hip pain and respiratory issues (Tr. 903, 909-11). Hip and chest x-rays were negative (Tr. 903, 917-19). When a doctor recommended antibiotics, Plaintiff complained that she was unable to tolerate antibiotics, as they caused upper GI bleeding and severe headache; Plaintiff requested to remain hospitalized (Tr. 903, 907, 909-101). Although her doctor had never heard of such a situation before, he decided he had to take Plaintiff "at her word" and transferred her to a skilled nursing unit for follow up (Tr. 903). The doctor emphasized the need for follow up with a primary care physician and encouraged

10

Plaintiff to stop smoking (Tr. 903).

Plaintiff presented to neurologist Stephen Kimbrough, M.D., on December 6, 2010, complaining of daily headaches and requesting refills of medications (Tr. 923-24). Findings upon physical examination were normal (Tr. 926). Dr. Kimbrough noted that Plaintiff was under stress recently due to the illnesses and recent death of her brothers (Tr. 923). He adjusted Plaintiff's medications and ordered diagnostic testing (Tr. 923). An MRI on December 29, 2010, showed minimal disc protrusion and kyphosis, but no significant degenerative changes (Tr. 928).

On January 5, 2011, Plaintiff told Dr. Kimbrough that she was sleeping much better, feeling less jittery, and functioning better (Tr. 922). Plaintiff had a number of complaints, but findings upon physical examination were unremarkable, other than tender nodes in her cervical chain (Tr. 922). Dr. Kimbrough continued Plaintiff's medications and told her to return in six months (Tr. 922).

On June 15, 2011, Krish Purswani, M.D., examined Plaintiff at the request of the state Disability Determination Services (DDS). Plaintiff reported a history of abdominal pain, back pain, COPD, chest pain, neck pain, and a mini-stroke (Tr. 938-39). Findings upon physical examination were largely normal (Tr. 940-41). Dr. Purswani assessed abdominal pain, gastritis, back pain, shortness of breath, COPD, chest pain, neck pain, mini-stroke, severe vision loss, and tobacco abuse (Tr. 941). He opined that Plaintiff could stand and walk for 7 hours a day, and sit for 8 hours in a day (Tr. 942). She could lift and carry up to 30 pounds frequently in a nonhazardous environment, thought she was limited to lifting non-fragile items due to severe vision loss in one eye (Tr. 941, 943).

When Plaintiff saw Dr. Kimbrough again on July 3, 2011, she was doing "quite well" (Tr. 921). Dr. Kimbrough found nothing to suggest any recurrent heart problems, and he noted that Plaintiff's pain and headaches were stable on medication (Tr. 921). Dr. Kimbrough noted that Plaintiff had no other major problems, and findings upon physical examination were unremarkable (Tr. 921). He instructed Plaintiff to find a primary care physician, as she did not have any significant neurological problems that would require his attention (Tr. 921).

[Doc. 26, pgs. 3-16].

At the administrative hearing on October 29, 2010, which led to the hearing decision which was remanded by the Appeals Counsel, the ALJ took the testimony of Bentley Hankins, a Vocational Expert ["VE"]. He asked Mr. Hankins to assume "that the claimant is capable of light work with no more than occasional handling or fingering with the non-dominant left upper extremity...and no concentrated exposure to pulmonary irritants." (Tr. 1056). When asked if that person could perform any jobs in the national economy, Mr.

11

Hankins replied "[t]here would be some jobs within those limitations, however, for example, at the unskilled level considering light jobs, only approximately 10 percent, between 9 and 10 percent require either a occasional or no handling of objects, so it is a relative limited amount. Some examples, for example, there are some security guard positions such as gate guards or gate tenders, surveillance system monitors, school bus monitors, there are various types of transportation attendants. As well as a limited number of counter or rental clerks. As far a numbers...in the United States, there would be approximately 450 to 500,000. And in the State of Tennessee there would be between 3 and 4,000."

At the administrative hearing held October 4, 2012, which led to the final decisions at issue in this lawsuit, the ALJ took the testimony of a different VE, Donna Bardsley. The ALJ asked Ms. Bardsley "to assume that the claimant is restricted to light exertion with no more than occasional climbing of ladders, ropes, or scaffolds. No more than occasional handling or fingering with the non-dominate left upper extremity. Assume she can't have any concentrated exposure to temperature extremes, pulmonary irritants, vibration, or dangerous moving machinery, or hazards...and assume that she can't have any exposure to unprotected heights. With those limitations, could a hypothetical person of her age, education level, and work experience and...closely approaching advanced age currently...could such an individual...perform other jobs in the national economy?" The VE identified some cashiers, with 600 in the region and 3,000,000 nationwide; sales clerks with 500 in the region and 2,000,000 nationwide; hostesses or greeters, with 325 in the region and 375,000 nationwide; and information clerks with 300 in the region and 300,000 nationwide. (Tr. 1076-1077).

12

On December 11, 2012, the ALJ rendered a hearing decision on her SSI claim, which covered the period from the date her SSI claim was filed on January 18, 2011, through the date of the decision (Tr. 23-31). He rendered a second hearing decision on the same date regarding the cessation of her disability insurance benefits (Tr. 1083-1092). The decision on the SSI claim went through the usual five-step sequential evaluation process. The decision on the disability insurance benefits claim utilized the eight-step sequential evaluation process required in 20 CFR § 404.1594.

With respect to the plaintiff's disability insurance claim and cessation of benefits, he first set out that the "comparison point decision" ["CPD"] was the March 22, 2002 decision which found that the plaintiff was still disabled. He found that at that the time of the CPD, her medically determinable impairment was a severe gastrointestinal disorder. However, at the time the Commissioner determined that her disability ended, October 1, 2008, she had other medical determinable impairments as well. Her impairments at that time were chronic active superficial gastritis with scattered heliobacter pylon-like organisms; probable irritable bowel syndrome; degenerative disc disease; a respiratory system impairment; the residual effects of a reported mini-stroke; a history of pernicious anemia; and anxiety. With respect to the history of pernicious anemia, he found that there were no disabling symptoms specifically attributable to this condition since the CPD, and that it was not a severe impairment. (Tr. 1085). With respect to anxiety, he found no restriction of activities of daily living, no difficulties in maintaining social functioning; and only mild difficulties in concentration persistence or pace. Therefore, he found that she did not have a severe mental impairment. He also found that "the claimant did not assert, and the record does not indicate,

13

any other medically determinable impairment that had more than a minimal impact on work-related ability..." (Tr. 1086).

He found that she did not meet or equal the requirements of any of the Listings in 20 CFR, Subpart P, Appendix 1. He then found that medical improvement had occurred as of October 1, 2008, with respect to the gastrointestinal impairment present at the time of the CPD. He stated that her symptoms had decreased and she had reported she was doing better. He noted her weight was stable and she did not require ongoing specialist treatment for her impairments. (Tr. 1086).

Because of the found decrease in severity in the impairment present at the CPD, he found that plaintiff as of October 1, 2008, had the residual functional capacity ["RFC"] "to perform light exertion...with no more than occasional climbing of ladders, ropes or scaffolds; no more than occasional handling or fingering with the non-dominate left upper extremity; and no concentrated exposure to temperature extremes, pulmonary irritants, vibration, dangerous moving machinery or hazards and no exposure to unprotected heights." In doing so, he stated he had considered all of the plaintiff's symptoms and the extent to which they were consistent with the objective medical records. He noted the requirements of *Drummond v. Commissioner of Social Security* and Social Security Acquiescence Ruling 98-4(6) and stated that he had followed them and the requirements of *Dennard*. (Tr. 1087).

He then discussed the plaintiff's gastric symptoms, including the lack of specialist treatment after March 2007, her reporting to the Dry Creek Medical Center that her symptoms were better, and that treatment records indicated that the plaintiff's weight had remained stable. He noted the mild findings regarding her musculoskeletal system. With

14

respect to plaintiff's testimony regarding left-sided weakness, he noted that his RFC finding had given her every benefit of the doubt irrespective of no complaints in the medical records directly relating to her "reported mini stroke" in 2010. (Tr. 1088).

He then discussed the consultative examination of Dr. Purswani conducted on June 15, 2011, giving his opinion great weight. He discussed the testimony of the plaintiffs, and found that it was not consistent with the evidence. He stated she had received no more than conservative treatment since the CPD. He discussed her non-severe mental impairment, noting her daily activities and active lifestyle and lack of psychiatric hospitalization. (Tr. 1089).

Based upon the RFC and the jobs identified by the VE, he found that the plaintiff's disability ceased on October 1, 2008, and that she had not been disabled through the date of his hearing decision. (Tr. 1091).

Other than following the five-step evaluation process, the decision regarding her SSI claim differs in no material way from the foregoing decision regarding cessation of disability (Tr. 23-31). To summarize, the ALJ found that the plaintiff was no longer entitled to disability insurance benefits after October 1, 2008, and was not disabled and thus not entitled to disability insurance benefits or SSI through December 11, 2012.

Plaintiff first argues that the ALJ erred in his handling of plaintiff's case by failing to follow the requirements of *Difford v. Secretary of Health and Human Services*, 910 F.2d 1316(6th Cir. 1998). The ruling in this case, which originally applied only to cases filed within the 6th Circuit, was the subject of Acquiescence Ruling ("AR") 92-2(6). That AR, which applied only in the Sixth Circuit, was replaced on a nation wide basis by Social

15

Security Ruling ("SSR") 13-3p in 2013. *Difford*, and these rulings, required the Commissioner not just to determine in cessation of disability case that the person's ability to work changed due to medical improvement in the condition(s) that originally rendered them disabled, but to determine if the person was disabled for any other reason through the date of the Commissioner's final decision (the ALJ's ruling). In the plaintiff's case, she argues that the ALJ simply found medical improvement in her gastrointestinal condition through October 1, 2008, when it, and other conditions, so reduced her RFC that when she turned 50 years of age in September, 2011, she would have been disabled under the Medical-Vocational Guidelines (the "Grid") at the full range of sedentary work. Since the ALJ found she could only perform what she argues was a severely reduced range of light work, plaintiff asserts that under SSR 83-12, she should have been found disabled.

The basis of this argument is that at the first hearing, VE Hankins opined that a person with plaintiff's limitations would be capable of only 9 to 10 percent of light jobs with her limitation of use of the non-dominant left arm set out in the ALJ's question to him. (Tr. 1057). SSR 83-12 states in part that when a person's RFC falls between two levels of work, in this case light and sedentary, and a person under the Grid would be disabled per se at the sedentary level but not disabled at the light level, "the adjudicator will consider the extent of any erosion of the occupational base and access its significance." If the ALJ is relying on the Grid and finds the occupational base eroded to the point where it does not represent a significant number of jobs, he or she may conclude that person is disabled. However, the ruling states that an adjudicator may utilize a VE, who "can assess the effect of any limitation on the range of work at issue...*advise whether the impaired person's RFC permits him or her*

16

*to perform substantial numbers of occupations with the range of work at issue; identify jobs which are within the RFC, if they exist; and provide a statement of the incidence of such jobs in the region in which the person lives or in several regions of the country.*" Emphasis added. *See,* also*, Branon v. Commissioner of Social Security*, 539 F.ed. Appx. 675, 679-80 (6th Cir. 2013) (citing SSR 83-12).

This is precisely what the ALJ did, not once but twice. At both hearings, two different VE's identified a substantial number of jobs which the plaintiff could perform with her RFC limitations. In fact, Ms. Bardsley, at the second hearing following remand, gave examples of even more jobs than did Mr. Hankins.

In this same regard, in connection with *Difford*, and its attendant rulings the plaintiff seems to somehow suggest that the ALJ did not adequately determine whether plaintiff was disabled as of the date of his final decision on December 11, 2012, but merely considered the evidence through October 1, 2008. The ALJ in fact considered all of the evidence in the record, especially MRI reports from 2010 and 2012, x-rays, and the extensive consultative examination by Dr. Purswani in June of 2011. The ALJ did not short-change the plaintiff with respect to *Difford*, and adequately considered the effect of SSR 83-12.

Plaintiff next argues that there was not substantial evidence of medical improvement to start with, first stating that the ALJ "pointed to no evidence which showed that the Plaintiff's condition had improved with the exception of her report to the Dry Creek Medical Center that her symptoms were better (TR 561)." In point of fact, her report that she was doing better was but part of the evidence taken into account by both the Social Security personnel who opined she had experienced medical improvement, and later by the ALJ.

17

First off, a report by a recipient of benefits to a health care provider that he or she is doing better is no small thing. But here there is much more suggesting a marked improvement. Her condition in 1996 was grave. She was having to take intravenous fluids on a weekly or biweekly basis. She was losing weight with every doctor visit (Tr. 201). She was terribly dehydrated and was hospitalized (Tr. 168-169). She had to take daily Phenergan injections and narcotic medication several times each day (Tr. 202). The ALJ in 1997 found her disabled for these reasons, although he suggested a review in the future to assess whether her condition improved. The first review in 2002 showed no appreciable medical improvement.

However, at the time the Commissioner determined that the gastrointestinal condition had improved, her weight was stable. She was no longer under ongoing treatment of specialists. She received conservative treatment and was no longer having to take the daily injections and IVs. Her treating doctors, on those occasions when she did seek treatment, noted that she was stable. In 2011, Dr. Kimbrough noted that the plaintiff was doing "quite well." In addition to the treating doctors, plaintiff's medical records were reviewed by the State Agency physicians. One of them, Dr. Misra, was even of the opinion that the plaintiff no longer had a severe impairment (Tr. 628). Of course, the ALJ did find severe impairments, and even found that her gastrointestinal impairment was still severe. But he relied upon various opinions, including that of Dr. Purswani, the consultative examiner, to reach his conclusion regarding the plaintiff's RFC.

With regard to substantial evidence, the plaintiff also asserts that the ALJ's question to the VE did not include all of her impairments, particularly her vision problems. Her vision

18

in her right eye, according to Dr. Purswani, was 2/25 and overall, but she lacked vision in her left eye. Dr. Purswani noted she could count her fingers at six inches. (Tr. 940). He opined that while she could not read "very small print," she could read an ordinary newspaper or book, and could view a computer screen even though it would be blurry. (Tr. 946). The only restriction Dr. Purswani placed upon the plaintiff because of her vision problem was to work in "a safe, nonhazardous environment" and to lift only "non-fragile items due to severe vision loss" in her left eye (Tr. 941). The ALJ included in his RFC finding a restriction against plaintiff being around dangerous moving machinery, hazardous situations and unprotected heights. Also, plaintiff reported that she watched television a lot of the time and did not mention vision issues in her disability filings or in her testimony before the ALJ. She stated she could read and write (Tr. 1068). The ALJ considered and adopted the restrictions of Dr. Purswani into his RFC. Thus, there was substantial evidence to support his question to the VE, including the limitations imposed by her vision and her musculoskeletal complaints.

Plaintiff's final issue is that she did not "knowingly and intelligently" waive her right to counsel in the disability determination process and at the various administrative hearings. She says the prejudice she suffered is clear because she did not cross-examine the vocational experts. Plaintiff, throughout the entire process, was advised of her right to counsel both in writing and orally (Tr. 221-222; 227-280; 235; 42; 1041-1042). She was not only told repeatedly she had a right to have an attorney, but the reasons why she should and the kinds of assistance an attorney could provide. The plaintiff is obviously an intelligent person, and understood her rights. She knowingly chose to proceed without counsel and represent herself. Her able counsel in this proceeding would have been an asset earlier in the process,

19

but that is not the standard to use in determining whether she knowingly waived her right to appear with him or other counsel to assist her. Plaintiff also argues that since she was representing herself, the ALJ had a duty to "scrupulously and conscientiously probe into all relevant facts," citing *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir., 1983). First of all, the ALJ in the present case did competently evaluate the evidence, and even gave her benefit of the doubt in finding greater levels of impairment than were set out in the medical reports. Secondly, the plaintiff is not of limited intelligence as the plaintiff was in *Lashley*. The Court does not believe an ALJ has a duty, when a person knowingly waives the right to counsel, to try to conceive of every argument and nuance a skilled attorney might employ in representing a Social Security claimant. The important thing is for the ALJ to be fair, and this one was.

There was substantial evidence to support all findings of the ALJ with respect to both hearing decisions. He did not commit any errors of law. It is accordingly RECOMMENDED that the plaintiff's Motion for Judgment on the Pleadings [Doc. 14] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 23] be GRANTED.[1]

Respectfully submitted,

  s/ Dennis H. Inman
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).